## Goebel *v.* Aschenbach & Miller Co. et al., Appellants.

316

Argued October 8, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Joseph Head, Jr.*, with him *John B. Martin* and *Duane, Morris & Heckscher*, for appellants.

*Maurice S. Levy*, for appellee.

OPINION BY CUNNINGHAM, J., November 13, 1940:

The insurance carrier of the employer in this compensation case has appealed from a judgment entered by the court below upon an award of compensation made by the referee on March 1, 1939, directing that compensation be paid the claimant for total disability,

at the rate of $12.87 per week, beginning on May 5, 1937, "to continue until such time as his disability shall cease or change in extent," etc. It appears of record from a stipulation filed by counsel on July 10, 1940, that the claimant died May 14, 1939, but there is nothing upon the record relative to the cause of his death or whether any dependents survived him.

The award of the referee was affirmed by the board December 29, 1939; the carrier's appeal to the common pleas from the action of the board was dismissed and judgment entered upon the award, June 25, 1940, for the period from May 5, 1937 to May 14, 1939, for a total sum, including interest, of $1430.74.

We are not satisfied that this appeal can be disposed of properly upon the present state of the record.

During the course of his employment on March 11, 1937, the claimant accidentally cut his right hand on a waste paper can. An open agreement was executed by the parties and approved by the board; it provided for compensation for total disability, at the rate of $12.87 per week, beginning March 30, 1937, and payments were made under it up to May 5, 1937, the date upon which the award here in question was directed to begin. In the paragraph of the agreement in which claimant undertook to "describe [the] accident and resulting injury" his description reads: "Cut hand on edge of waste paper can."

It is not controverted that at the time of the above described external accidental injury the claimant was suffering from a serious arteriosclerotic heart disease, described by the doctor who attended him immediately after the accident as "angina pectoris—cardio-vascular-renal disease."

The controlling issue in the case is whether the claimant's heart ailment had been so aggravated by the injury to his hand that, under the provisions of our Workmen's Compensation Act of June 2, 1915, P. L. 736, 77 PS §1 et seq., he was entitled to compensation for

total disability subsequent to May 5, 1937, the date of the last payment under the agreement. That issue was raised by the filing, on July 31, 1937, under Section 413 of the statute, as amended April 13, 1927, P. L. 186, 77 PS §§771-774, of the carrier's petition for termination of the agreement. The ground set forth therein was that claimant had recovered from the accident; and that if he had any disability beyond the date to which he had been paid under the agreement, such disability was "not related to [the] alleged injury of March 11, 1937." In his answer, claimant averred he was still disabled as a result of the accident, had no strength in his hand, and was still under the care of his physician.

At the first hearing before the referee, the carrier, in endeavoring to sustain the burden assumed by it in undertaking to have the agreement terminated, called Dr. Frederick Ondovchak to whom claimant went for treatment a few days after the injury to his hand. This witness testified claimant then had an infected right hand which he incised and drained. Frequent treatments followed until the early part of May when, in the language of the witness, the hand "was finally healed," but the patient still had "some stiffness and loss of function," for which he was treated by a Dr. Ross until the condition had been practically removed. Dr. Ondovchak stated his last treatment for the hand alone was on May 7th, at which time claimant, in the opinion of the witness, had the use of his hand for industrial purposes.

Dr. Ondovchak testified he had also been treating claimant during the same period of time for the heart condition above mentioned. Upon the question of any possible effect of the injury to claimant's hand upon his heart ailment, Dr. Ondovchak's testimony in chief was that the heart condition had been coming on over a period of many years, and although claimant had an infection from the injury to his hand it was "localized"

and, in the opinion of the witness, had no effect upon his heart. As to the extent of the disability from which claimant was suffering at the time of the hearing, (November 4, 1937,) the witness said his heart condition was such that he would not advise him to attempt the work he had been doing at the time of his injury. Dr. Ondovchak's opinion was that the claimant's inactivity from the injury to his hand had been a factor in the development of his heart symptoms. Referring to the effect of inactivity from any cause upon claimant's condition, the witness testified: "Q. Then in your opinion the fact that he wasn't working caused this condition to appear? A. Not exactly because it is practically—there is a climax to everything and suddenly keeps on getting worse and this condition without the accident *probably* would have happened just the same." (Italics supplied.)

Dr. Ondovchak had no personal knowledge of claimant's heart condition prior to the time of the accident but testified he began treating him for that ailment in March, 1937, and that claimant in the first part of April had complained of dizziness.

Claimant was then called and testified he was seventy-three years of age and before the accident in March had never had any pains around his heart, had never been "treated for a heart condition by anybody," and had not seen a doctor for ten or fifteen years. He further testified he had been working for his present employer for fifteen years doing heavy work—shoveling and lifting heavy weights.

Dr. Ondovchak having been recalled for further cross-examination, again referred to the inactivity caused by claimant's hand injury and said there was thus "an indirect connection" between that injury and claimant's then existing disability. As to the extent of his disability, the witness expressed the opinion that claimant "could do some light work."

In view of the concession by appellants' own medical witness that claimant was at least partially disabled, it became necessary for the referee to inquire whether there was any direct causal connection between the injury to claimant's hand and his disabling heart condition.· It was contended on behalf of claimant that the hand injury had so aggravated and accelerated the progress of his heart ailment as to render him totally disabled and entitle him to a continuance of compensation. Appellants' theory was that claimant's then existing disability was due entirely to the normal progress of his heart ailment.

At this stage of the proceedings the referee very properly appointed Dr. Louis B. LaPlace, a specialist in diseases of the heart, as an impartial expert to examine claimant and prepare himself to testify at a subsequent hearing. At the hearing on January 25, 1938, Dr. LaPlace testified that his examination of claimant on November 18, 1937, revealed an advanced degree of arteriosclerotic heart disease. His testimony continued: "The fact that shortly after the accident on March 11, 1937, the claimant became short of breath and suffered from pain in his chest indicates that a decrease in the heart took place at that time. The underlying heart disease has existed for many years and during this period the efficiency of the heart has been progressively decreasing as the disease has become increasingly more severe. It is obviously impossible, therefore, to state with certainty that the accident was not purely coincidental and devoid of any causal relationship. On the other hand, I consider that infection, pain, worry and sudden change in long-established routine such as occurred following the claimant's accident are capable of causing some decrease in the efficiency of the heart. In the present case, I believe that the influence of these factors accelerated the course of the disease so that physical incapacity occurred shortly after the accident,

rather than at a later date. Q. Then, I take it, it is your opinion that this accident together with the resultant break-up of the claimant's normal life and attendant worry, is really the cause of an aggravation of his arteriosclerotic heart? A. I believe that it caused the symptoms of heart disease to occur at an earlier date than they would have occurred if this accident had not taken place. To that extent they are accelerating factors. Q. You can't tell us how soon this might have occurred if the accident had not occurred? A. No, I can not. In a case of heart disease of this type these symptoms might have appeared at any time over a period of ten years, perhaps, even before the accident, so that irrespective of my examination, on the basis of probability alone, it is more likely that the symptoms had some relationship to the accident."

The fourth finding of fact of the referee was: "That the accident which the claimant suffered in this case accelerated the course of the claimant's heart disease to such an extent as to cause him to be so disabled as to be unable to do practically any work whatever." This finding was necessarily based upon the above quoted testimony of Dr. LaPlace; there is no other competent testimony on the record which would support such a finding. The effect of the award, based upon the finding, was an order to appellants to resume and continue the payments provided for by the agreement. Aside from the question whether the testimony would justify an award for more than partial disability, it must be noted that the opinion of Dr. LaPlace was distinctly predicated upon the assumption that claimant was telling the truth when he testified he had never been treated for a heart ailment prior to the injury to his hand. An excerpt from his testimony upon cross-examination reads: "Q. Your opinion depends then on one particular factor, namely that he had no symptoms prior to March, 1937? A. It does. Q. *And your whole*

*opinion is based on that? A. Yes.* Q. And if that fact is not correct then your opinion would be altered? A. Then I would not be in a position to say with any assurance that this had any aggravating effect on his heart. May I say in explanation of that point that after all, my examination shows an enlarged heart which probably has not changed in its X-ray appearance since the accident. It shows an electrocardiogram which has not probably changed and the physical signs on examination are undoubtedly the same. So that my *judgment must necessarily depend on the statement of the patient* and that, of course, is a very very common situation in the diagnosis of heart diease. It is perfectly well recognized that a person who complains of severe pain in his chest may go to a physician who finds absolutely no evidence of disease in the heart and the patient may die the next day so that the *history* is often, as in this case, the *deciding factor* in the final opinion of the physician." (Italics supplied.)

The original award was made on January 27, 1938, and an appeal therefrom taken to the board. Shortly thereafter the insurance carrier petitioned the board for a further hearing, alleging it was then prepared to show that claimant had, in fact, been treated for his heart ailment as early as 1935. The record was thereupon remanded to the referee for "further hearing and determination." When the case again came on for hearing before the referee on December 15, 1938, Dr. W. E. Crain was called in behalf of appellants.

After stating he had been called to see claimant at his home on May 26, 1935, the witness continued: "On examination, I found that he had a serious heart lesion, pulse was intermittent, and the heart beat was intermittent every third beat, and he had reduplication of the heart first sound. At the apex of the heart the heart was enlarged. I put him on heart medicine and nerve sedative. The next time I saw him was June 6th

in my office 7:10 P.M., said he was sleeping much better, urine he was passing was good; he complained of weakness in his legs, said he had less dyspnoea. I found his heart action was stronger, and I continued him on the heart tonic and nerve sedative. Came in again on June 12, at 7:10 P.M., told me that his shortness of breath and dyspnoea was much less and the weakness in his legs continued, said he was worrying a great deal; his heart action was stronger but still intermittent ...... Q. Did you tell him that he had a heart condition? A. Yes."

Dr. Crain added that the termination of a heart condition such as claimant had might either be "very sudden" or a "gradual. drop down."

Another question and answer read: "Q. In your opinion, doctor, from the examination of this man which you made, do you think he had any of these pericardial symptoms during the period from June 1935 down to 1937? A. I haven't seen the man since 1935 to examine and know nothing about his present condition, and I cannot answer that question except, there would be a gradual increase in his heart condition."

Claimant, when recalled for further cross-examination, admitted the treatments testified to by Dr. Crain and that the latter had told him he was treating him for a heart condition. When asked why he had not disclosed these facts at the prior hearings, claimant replied: "I didn't think about it, that is what is the matter."

Instead of recalling Dr. LaPlace for the purpose of ascertaining from him the effect of the testimony of Dr. Crain, and the admission of claimant, upon his opinion, as expressed at the hearing on January 25, 1938, the referee merely "republished" his findings of fact as made prior to taking the testimony of Dr. Crain, dismissed the petition for termination and again entered an award of compensation for total disability.

The testimony of Dr. Crain demolished the entire

foundation upon which the opinion of Dr. LaPlace had been expressly rested by him at the time of its expression.

We think it became the plain duty of the referee, in the light of the uncontroverted testimony of Dr. Crain, to recall Dr. LaPlace for the purpose of learning from him whether, under all the facts then appearing upon the record, it was his professional opinion that the injury to claimant's hand had aggravated his preexisting and progressive heart ailment to such an extent that a material percentage of his disability was attributable to that accidental injury. See *Bittner v. Saltlick Township*, 109 Pa. Superior Ct. 406, 411, 167 A. 483.

Our conclusion is that this record must be returned to the board for the purpose of recalling and further examining Dr. LaPlace and for the taking of such other competent evidence as either party may offer. This conclusion renders it unnecessary to consider the other questions discussed in the briefs.

If the compensation authorities should finally conclude that claimant was entitled to additional compensation, attention should be given, in view of the stipulation relative to his death, to the provisions of the third paragraph of Section 410 of the statute, as amended, 77 PS §751, governing the disposition of compensation due to a claimant at the time of his decease. The judgment appealed from was entered in favor of claimant more than a year after his death. It should also be remembered, in this connection, that the fundamental right of claimant to receive compensation arose out of the agreement, and the controversy related to the question whether or not the agreement should be terminated. See Skinner's Pennsylvania Workmen's Compensation Law, Third Edition, pages 561-564.

The judgment is reversed and the record remitted to the court below to the end that it may be remanded to the board for further proceedings consistent with this opinion.